# UNITED STATES v. KAHAN

No. 73–428. Decided February 25, 1974

PER CURIAM.

Respondent, a former Immigration inspector, was convicted by a jury in the District Court of numerous counts under a multiple-count indictment; the conviction covered 20 counts of improperly receiving gratuities for official acts, in violation of 18 U. S. C. § 201 (g), and one of perjury before the grand jury, in violation of 18 U. S. C.

§ 1623, arising out of a scheme to defraud nonresident aliens and the Immigration and Naturalization Service. The Court of Appeals reversed respondent's conviction and remanded the case for retrial. 479 F. 2d 290 (CA2 1973). Respondent's motion to proceed *in forma pauperis* in this Court, and the petition for a writ of certiorari, are granted. The judgment of the Court of Appeals is reversed, and the case is remanded to the District Court for reinstatement of the judgment of conviction.

At respondent's arraignment, counsel was appointed under the Criminal Justice Act of 1964, 18 U. S. C. § 3006A (b), to represent him after he requested the appointment and stated that he was without funds. In response to a direct question as to whether he had funds to employ an attorney, he failed to disclose that he had access to and control of four savings accounts in which he had deposited approximately $27,000 during 1970 and 1971,[1]

---

[1] The transcript of the colloquy at arraignment reads in part as follows:

"The Court: Your name, sir?

"The Defendant: I am Norbert Kahan, sir.

"The Court: Have you an attorney?

"The Defendant: No, sir.

"The Court: Have you any money to hire an attorney?

"The Defendant: I do, sir, but it's blocked by my wife from whom I am divorced.

"The Court: Do you want a week to try and straighten that out?

"The Defendant: There is a suit coming up sometime early next year.

"The Court: We can't wait until next year.

"The Defendant: Then if it pleases the Court I would like to have the Court assign me an attorney.

"The Court: You have no current funds?

"The Defendant: I beg your pardon?

"The Court: You have no current funds at all?

"The Defendant: No, sir.

"The Court: Are you working?

and from which he made frequent withdrawals immediately subsequent to the arraignment. The accounts were apparently established by respondent in so-called "Totten trusts" for his children as the intended donees; under New York law these trusts were revocable at respondent's will. *In re Totten,* 179 N. Y. 112, 71 N. E. 748 (1904). The deposits to these undisclosed accounts aggregated more than the $25,000 which respondent reported as his total legitimate income on his tax returns for 1970 and 1971, and evidence of the deposits was admitted at trial as supporting the inference that he improperly received the gratuities as was charged. As part of the Government's case in chief the District Court admitted evidence of respondent's statements to the court as to his lack of funds.[2] The statements were admitted as false exculpatory statements evincing respondent's consciousness that the bank deposits were incriminating, and as evidence of willfulness in making statements before the grand jury with knowledge of their falsity.

The Court of Appeals held that the admission of respondent's false statements violated his Fifth Amendment privilege against compulsory self-incrimination and

---

"The Defendant: No, sir.

"The Court: I'm going to assign Mr. Jesse Berman at this point."
At trial it was determined that respondent never made these averments under oath, either orally or by presentment of written affidavit.

[2] Respondent contended at trial that he understood himself to be merely the custodian of the four "Totten trusts," which he said belonged to his children. The trial judge ruled, out of the jury's presence, that there was sufficient proof of falsity to warrant the admission of his statements, that the false statements were relevant to issues on trial, and that the prejudicial effect of the statements did not outweigh their probative value. The jury was ultimately instructed that it should consider respondent's false statements only for the limited purposes, as set forth in text, for which they were introduced.

his Sixth Amendment right to counsel because in its view the "ultimate truth of the matter asserted in the pretrial request for appointed counsel is of no moment. *See* Simmons v. United States, 390 U. S. 377." 479 F. 2d, at 292. The Court of Appeals cited *United States* v. *Branker,* 418 F. 2d 378 (CA2 1969), for its application of *Simmons* v. *United States,* 390 U. S. 377 (1968), to the assertion of the Sixth Amendment right. The Court of Appeals' reliance on *Simmons* misconceives the thrust of that holding.

In *Simmons* one of the defendants, in an attempt to establish standing to move for suppression of a suitcase containing incriminating evidence seized by the police, testified at the pretrial suppression hearing that the suitcase was similar to one he owned. The motion to suppress was denied, and the Government used the defendant's testimony against him in its case in chief. Viewing the testimony as an "integral part" of the claim for exclusion, the Court held its use impermissible because it conditioned the exercise of what the defendant "believed . . . to be a valid Fourth Amendment claim" on a waiver of the constitutional privilege against compulsory self-incrimination. *Id.,* at 391, 394.

To establish standing to move for suppression of evidence assertedly illegally seized, the claimant must show the kind of interest in that evidence set forth in *Brown* v. *United States,* 411 U. S. 223, 229–230 (1973), which would necessarily be incriminating should the motion fail and the defendant's interest therein be introduced. The need to choose between waiving the Fifth Amendment privilege and asserting an incriminating interest in evidence sought to be suppressed, or invoking the privilege but thereby forsaking the claim for exclusion, creates what the Court characterized as an "intolerable" need to surrender one constitutional right in order to assert another. *Simmons,* 390 U. S., at 394.

Even assuming that the *Simmons* principle was appropriately extended to Sixth Amendment claims for appointed counsel by the *Branker* holding, a question which we do not now decide, cf. *McGautha* v. *California*, 402 U. S. 183, 210–213 (1971), that principle cannot be applied to protect respondent here. *Simmons* barred the use of pretrial testimony at trial to prove its incriminating content. Here, by contrast, the incriminating component of respondent's pretrial statements derives not from their content, but from respondent's knowledge of their falsity.[3] The truth of the matter was that respondent was not indigent, and did not have a right to appointment of counsel under the Sixth Amendment. We are not dealing, as was the Court in *Simmons*, with what was "believed" by the claimant to be a "valid" constitutional claim, see n. 2, *supra*. Respondent was not, therefore, faced with the type of intolerable choice *Simmons* sought to relieve. The protective shield of *Simmons* is not to be converted into a license for false representations on the issue of indigency free from the risk that the claimant will be held accountable for his falsehood. Cf. *Harris* v. *New York*, 401 U. S. 222, 226 (1971).

*Reversed and remanded.*

MR. JUSTICE DOUGLAS, with whom MR. JUSTICE BRENNAN concurs, dissenting.

Mr. Justice Harlan speaking for the Court in *Simmons* v. *United States*, 390 U. S. 377, 394, said: "[W]e find it intolerable that one constitutional right should have to

---

[3] The grounds for admitting respondent's false statements, *supra*, at 241, make it clear by necessary implication that the trial judge—who alone decides the question of relevancy—thought respondent had willfully made false representations. Respondent's withdrawals from the aforementioned accounts shortly after he denied having current funds lend support to that view.

be surrendered in order to assert another." In that case an accused testified on a motion to suppress evidence in order to protect his Fourth Amendment rights but later discovered that the testimony would be used by the prosecution against him. We held that the testimony the defendant gave on a motion to suppress evidence on Fourth Amendment grounds was not admissible against him at trial on the issue of guilt "unless he makes no objection." *Ibid.*

If an accused in order to protect his Fourth Amendment right gives testimony that is protected by the Self-Incrimination Clause of the Fifth Amendment, I fail to see how testimony protective of Sixth Amendment rights is on a lower level. In *United States* v. *Jackson,* 390 U. S. 570, we held unenforceable provisions of a federal act which made the death penalty applicable only to those who contested their guilt before a jury. The "inevitable effect" in that case was "to discourage assertion of the Fifth Amendment right not to plead guilty and to deter exercise of the Sixth Amendment right to demand a jury trial." *Id.,* at 581.

The suggestion that no Sixth Amendment right existed in this case does not find support in the record. There is no finding as to the amount of the funds restricted and beyond the reach of the respondent, or as to what free funds he actually had or as to what were his obligations. Yet all of these facts would be necessary before we could reach that conclusion. This Court in passing on applications to proceed *in forma pauperis* looks not only to what the applicant's income and/or cash position is but what his periodic liabilities are. Thus a person with an income of $600 a month has been allowed to proceed *in forma pauperis* where his present obligations consume his entire income. The mere fact that one has money in the bank is therefore not enough

to make frivolous his claim of indigency for purposes of *in. forma pauperis.* We may not therefore responsibly say there was no genuine Sixth Amendment right to counsel in this case.

Moreover, whether one has a bona fide claim to appointed counsel is a legal point which laymen should not have to determine before they may speak without fear. The funds here involved were in Totten trusts and Kahan thought that he had no access to them under the law. One should not have to seek advice on points of law nor have an audit conducted on his personal finances before he feels free to assert his Sixth Amendment rights. Statements made in good faith may later turn out to be false and all those who utter the statements run the risk that they may not be able to convince others of their sincerity. If "tension" between the Sixth and Fifth Amendments arises only when judges, with the benefit of hindsight and legal acumen not possessed by the defendant, later determine the Sixth Amendment claim to be "bona fide," many indigents with legitimate claims to appointed counsel will hesitate to speak freely in asserting the claim. As the court below phrased it, the defendant will be "forced to gamble his right to remain silent against his need for counsel or his understanding of the requirements for appointment of counsel." 479 F. 2d 290, 292.

The principle of *Simmons* and *Jackson* is applicable, if reason is to prevail, where rights under the Fifth Amendment are entangled with rights under either the Fourth or the Sixth Amendment. There is such entanglement here, for the Fifth Amendment is as applicable to evidence concerning crimes with which the accused has not yet been charged as it is to evidence concerning crimes already charged. That was so held

by a unanimous Court in *Counselman* v. *Hitchcock*, 142 U. S. 547, 562:

"It is broadly contended on the part of the appellee that a witness is not entitled to plead the privilege of silence, except in a criminal case against himself; but such is not the language of the Constitution. Its provision is that no person shall be compelled in *any* criminal case to be a witness against himself. This provision must have a broad construction in favor of the right which it was intended to secure. The matter under investigation by the grand jury in this case was a criminal matter, to inquire whether there had been a criminal violation of the Interstate Commerce Act. If Counselman had been guilty of the matters inquired of in the questions which he refused to answer, he himself was liable to criminal prosecution under the act. The case before the grand jury was, therefore, a criminal case. The reason given by Counselman for his refusal to answer the questions was that his answers might tend to criminate him, and showed that his apprehension was that, if he answered the questions truly and fully (as he was bound to do if he should answer them at all), the answers might show that he had committed a crime against the Interstate Commerce Act, for which he might be prosecuted. His answers, therefore, would be testimony against himself, and he would be compelled to give them in a criminal case."

The Court of Appeals was correct in its application of this issue and I would affirm.

Mr. Justice Marshall, dissenting.

As the Court's *per curiam* opinion indicates, there is a tension between the Sixth Amendment right to ap-

pointed counsel for indigent defendants and the Fifth Amendment comparable to the tension between the Fourth and Fifth Amendments recognized in *Simmons* v. *United States,* 390 U. S. 377 (1968). The situation presented in *United States* v. *Branker,* 418 F. 2d 378 (CA2 1969), is instructive. There, in truthfully revealing his financial situation at the pretrial indigency hearing, the defendant disclosed that he had received $250 from a coconspirator. In order to assert his Sixth Amendment right to counsel, in other words, he was forced to provide potentially incriminating evidence.

As I view the matter, this tension between the Fifth and Sixth Amendments could be resolved in one of two ways. The first alternative is to permit the defendant seeking counsel as an indigent to lie about his financial situation wherever the truth might be incriminating. As a second alternative, we could require the defendant seeking appointment of counsel to tell the truth at the indigency hearing, and subject him to sanctions for his willful and knowing failure to do so, but bar use of any incriminating information so revealed.

I, for one, do not consider the first alternative to be acceptable. Nor did the Court of Appeals in this case, for it conceded that if the defendant willfully misrepresented his assets at the pretrial hearing, he could be prosecuted for perjury or false statement. 479 F. 2d 290, 292 n. 3 (CA2 1973). See, *e. g., United States* v. *Birrell,* 470 F. 2d 113 (CA2 1972). Likewise, respondent's Memorandum in Opposition disclaims any "right to lie" at the pretrial hearing.

In view of its concession that the defendant can be penalized for willfully and knowingly falsifying information at a pretrial suppression hearing, I cannot understand the Court of Appeals' conclusion that this sanction can only take the form of a separate prosecution for per-

jury. If the defendant's willfully false statement can be used against him at a subsequent perjury trial, I see no reason why it cannot be used against him at his pending criminal trial.

My Brother DOUGLAS raises the possibility that a defendant will fail to exercise his Sixth Amendment rights for fear that a court may later find the Sixth Amendment claim not bona fide or his statements not made in good faith. This reasoning would not only control the present case, however, but would also bar the Government from bringing a perjury prosecution against a defendant who knowingly and willfully lies under oath at his pretrial hearing. For it could likewise be argued that a defendant will fail to exercise his Sixth Amendment rights for fear that a jury may later determine that he committed perjury at the indigency hearing.

The problem is not a frivolous one, but its solution does not lie, in my view, in permitting the defendant to perjure himself and remain free from sanction. Rather, it lies in procedures to ensure that the imposition of sanctions in appropriate cases will not in fact discourage good-faith assertions of Sixth Amendment claims. With respect to a subsequent perjury prosecution, the discouragement of legitimate Sixth Amendment claims is minimized by the requirement that the Government convince a jury that the defendant willfully and knowingly gave false testimony. I would provide a similar protection where the Government seeks to use a defendant's allegedly false pretrial statement as evidence against him at his pending criminal trial. Where such statement was purportedly given in furtherance of a Sixth Amendment right, I would bar the Government from introducing it in evidence unless the Government proved and the trial court found that the defendant had knowingly and willfully provided false information.

The solution, then, to the tension between the Fifth and Sixth Amendments is to require the defendant seeking appointment of counsel to tell the truth at his indigency hearing, and to bar use of any incriminating information so revealed. This approach is fully consistent with our Fifth Amendment cases. "[A] witness protected by the privilege may rightfully refuse to answer unless and until he is protected at least against the use of his compelled answers and evidence derived therefrom in any subsequent criminal case in which he is a defendant." *Lefkowitz* v. *Turley,* 414 U. S. 70, 78 (1973). Where the Government requires the defendant to speak in order to assert his Sixth Amendment rights, it must shelter him with the immunity provided by the Fifth Amendment for such compelled testimony. Cf. *United States* v. *Branker, supra.*

Applying these principles to the present case, I believe respondent's conviction was properly reversed by the Court of Appeals. At trial, Kahan claimed to have understood that the Totten trust accounts he opened belonged to his children, with himself merely the custodian. See 479 F. 2d, at 292 n. 3 and 296 n. 3. The District Court never made a finding, before admitting evidence of Kahan's pretrial statements, that Kahan had willfully misrepresented his financial situation and in fact knew that the funds in the Totten trusts were his. The court found sufficient proof that the statements were false to warrant their admission, but this finding does not satisfy the test I would apply. The mere fact that a false statement was made is not enough. Statements which turn out to be false are often made in the good-faith but mistaken belief they are correct, cf. *New York Times Co.* v. *Sullivan,* 376 U. S. 254 (1964), and we should be cautious not to penalize good-faith assertions of Sixth Amendment rights.

I would affirm the judgment of the Court of Appeals.