Eldred M. FORNAH, Appellant,

v.

UNITED STATES, Appellee.

No. 81–736.

District of Columbia Court of Appeals.

Argued Oct. 13, 1982.

Decided April 4, 1983.

Henry W. Asbill, Washington, D.C., appointed by this court, for appellant.

Richard H. Gordin, Asst. U.S. Atty., Washington, D.C., with whom Stanley S. Harris, U.S. Atty., John A. Terry, Asst. U.S. Atty., Washington, D.C., at the time the brief was filed, and Michael W. Farrell and Constance L. Belfiore, Asst. U.S. Attys., Washington, D.C., were on the brief, for appellee.

Before KERN and PRYOR, Associate Judges, and DOYLE,* Associate Judge, Superior Court of the District of Columbia.

* Sitting by designation pursuant to D.C.Code § 11–707(a) (1981).

KERN, Associate Judge:

Appellant was tried for second-degree murder, D.C.Code §§ 22–2403, –3202 (1981), for shooting to death the victim, but the jury convicted him of the lesser-included offense of involuntary manslaughter, D.C. Code § 22–2405 (1981).[1] He contends that his conviction must be reversed because the trial court erred in admitting certain evidence at trial and the prosecutor, both in argument and by examination of the witnesses, conducted herself improperly.

In essence, the government's case at trial was that the victim, formerly romantically involved with appellant, was fatally shot by a single bullet from a .38 caliber revolver while visiting appellant in his apartment; that neighbors confirmed the fact that an argument had taken place in the apartment followed by a shot-like sound and saw a .38 caliber pistol thrown out of that apartment's window; and, that appellant told a suspicious-sounding story both at the scene, after discovery of the body by paramedic personnel whom he had called, and upon formal questioning by the police at headquarters.[2]

The theory of the defense at trial was articulated by appellant who took the stand in his own defense. He admitted that he had lied to the police when he told them he was absent from his apartment and did not know how the victim had been shot to death. Rather, appellant testified that the victim had become angry and first had verbally abused him, then thrown a shoe at him, and finally walked toward him with an unknown object concealed in a paper bag. Alarmed, appellant had grabbed the bag, a struggle ensued and an explosion occurred, causing the victim's death from the single shot of a revolver which the bag had contained.

Appellant first complains that the trial court erred in permitting, over objection, questions of the decedent's father concerning decedent's vocation as a social-worker.[3] Appellant argues that in effect the government was thereby permitted, unfairly, to bring to the jury's attention the good and peaceful character of the victim in contrast to the allegedly violent nature of the appellant. Under the circumstances we are not persuaded that the probative value of the testimony by decedent's father, which provided some background on the victim's life and career and her relationship to appellant, *see Gezmu v. United States,*

1. Involuntary manslaughter may be defined as behavior that includes: "(1) an 'unreasonable failure to perceive the risk of harm to others,' while engaging in (2) conduct resulting in extreme danger to life or of serious bodily injury." *Faunteroy v. United States,* 413 A.2d 1294, 1298 (D.C.1980) (citations omitted), citing *United States v. Bradford,* 344 A.2d 208, 215 (D.C.1975).

2. Specifically, after an ambulance came to the building of appellant's apartment he contradicted himself to a paramedic as to whether any other person was then in his apartment in addition to the decedent. He told the police that he had left the deceased alone briefly to do an errand and hypothesized that an unknown person or persons must have entered while he was gone, yet his apartment was in good order, the victim, who had been clad only in her underwear, had not been physically assaulted or sexually abused, and no money or other valuables had been taken.

3. The relevant portion of the transcript reads as follows:

Q. Okay. Now, also about Teresa, would you tell us just a little bit of something about her, about her education about—
[Objection on the grounds of relevancy—overruled subject to the testimony's being "connected up later."]
Q. Would you tell us a little bit about her education and her job training.
A. She finished high school in Philadelphia. She went to Shaw University. She majored in social science. And she also worked in Rochester, New York, as a social worker.
Q. To your knowledge, did she ever work in the District of Columbia as a social worker?
A. Yes. And she came here and worked here as a social worker also.
Q. Um-hum.
A. And then she moved back to Philadelphia with me and she was working as a social worker also in Philadelphia.
[Record at 61–62.]

375 A.2d 520, 522 (D.C.1977), was outweighed by possible prejudice to the appellant. Accordingly, we uphold the trial court's ruling.

■ Next, appellant complains that the court erred in admitting at trial as a part of the prosecution case testimony by a former roommate of the deceased that some ten months earlier she had seen appellant strike and "stomp" on decedent during a quarrel. We conclude that the trial court improperly admitted this evidence under these circumstances. However, once the appellant took the stand and testified in his own defense that the decedent had attacked him first, the evidence concerning his physical attack on decedent ten months earlier had substantial probative value outweighing the prejudice of such evidence and hence we deem the error to have been harmless.[4]

■ Finally, appellant urges that the court erred in (1) permitting a witness to testify that on two occasions prior to the incident here the appellant had tried to sell him a pistol, and (2) allowing another witness to testify that on occasions prior to the shooting she had seen a pistol in appellant's apartment. Central to the court's admission of this testimony was appellant's statement to the police that he had *never* owned a pistol. The challenged evidence, of course, contradicted this assertion and would permit the jury, if it believed the two witnesses, to conclude appellant's statement shortly after the crime was false and to infer from such falsehood a consciousness of guilt on appellant's part. *United States v. Kahan,* 415 U.S. 239, 241–43, 94 S.Ct. 1179, 1180–81, 39 L.Ed.2d 297 (1974). *See Cogdell v. United States,* 113 U.S.App.D.C. 219, 307 F.2d 176 (1962), *cert. denied,* 371 U.S. 957, 83 S.Ct. 515, 9 L.Ed.2d 505 (1963). *Cf. Ward v. United States,* 386 A.2d 1180 (D.C. 1978). Because appellant did not object to the admission of this evidence it would be

necessary for him to establish that its admission was plain error, *Watts v. United States,* 362 A.2d 706, 709 (D.C.1976) (en banc), calling into question the very fairness and integrity of the trial. Clearly, no such error exists here. Accordingly, the trial court's admission of this evidence was proper.

■ We turn now to appellant's assertions of prosecutorial misconduct. Preliminarily, we note the Supreme Court's teaching in *Donnelly v. DeChristoforo,* 416 U.S. 637, 647, 94 S.Ct. 1868, 1873, 40 L.Ed.2d 431 (1974), that in a lengthy trial involving a number of witnesses on a strongly-disputed issue, such as was the case here, an appellate court "should not lightly infer" prejudicial error from a remark or a question by a prosecutor during the heat of the trial. Here, the prosecutor commenced the trial necessarily with her case resting entirely upon circumstantial evidence because there were no witnesses to the shooting of the victim.

■ Appellant points to a remark by the prosecutor in her opening statement outlining the government case that appellant had, during a conversation with a prosecution witness, "admitted that he did it [the shooting] but ... claimed it was an accident." (Record at 56.) In fact, this witness testified that appellant first told her "it [the shooting] was an accident," but then refused to discuss the incident further. (Record at 254.) While it may be seen that the prosecutor's reference to what the witness would testify was not entirely consistent with what she did in fact testify, we cannot say the variance was so prejudicial as to require reversal.

■ Next, appellant claims the prosecutor improperly taxed him during cross-examination after he took the stand with a failure to testify before the Grand Jury in this case and thereby ran afoul of the Su-

---

4. Where a defendant raises a claim of self defense, evidence of prior aggressive conduct is admissible. *See, e.g., Rink v. United States,* 388 A.2d 52, 56 (D.C.1978). The passage of time between the two incidents, *viz.,* ten months, is not so great as to render the witness' testimony inadmissible. *See United States v. Bobbitt,* 146 U.S.App.D.C. 224, 227–28, 450 F.2d 685, 688–89 (1971).

preme Court's holding in *Grunewald v. United States*, 353 U.S. 391, 77 S.Ct. 963, 1 L.Ed.2d 931 (1957).[5] Appellant conceded during cross examination that he had lied both on the scene and to the police at headquarters in telling them he did not know how the decedent had been shot. (Record at 350.) His excuse for the lie was his immediate fear of the consequences, but after consulting a lawyer he testified in response to the prosecutor (Record at 351): "I thought I could confide in my lawyer and tell him the truth." At that point, the prosecutor asked:

> Did you ever think of going to the Grand Jury and telling them the truth?

When appellant replied in the affirmative to her question, the prosecutor commented: "But you didn't do it, did you?" Appellant then responded: "I was not called, ma'am." (Record at 351.) This question by the prosecutor was improper. Given the fact, however, that there was no defense objection to this colloquy between the prosecutor and the appellant during his cross-examination, that appellant had not actually appeared before the grand jury and refused to testify, and keeping in mind the Supreme Court's admonition in *Donnelly,* we are not persuaded this amounted to plain error requiring reversal, particularly because the prosecutor made no further reference to the matter in argument or otherwise.

■ Finally, appellant cites various alleged improprieties in the prosecutor's closing argument to the jury which in his view warrant reversal. Assuming that the prosecutor engaged in improper jury argument we must consider the closeness of the case; the nature of the misconduct and its centrality *vel non* to the case; whether there was defense objection; and, the steps taken by the trial court to lessen the impact of the misconduct. *Smith v. United States,* 315 A.2d 163, 166, (D.C.), *cert. denied,* 419 U.S.

896, 95 S.Ct. 174, 42 L.Ed.2d 139 (1974), *quoting Gaither v. United States,* 134 U.S. App.D.C. 154, 172, 413 F.2d 1061, 1079 (1969). Here, there was no objection by the defense and the trial court charged the jury with a standard instruction that it must decide the case only upon the evidence and not upon the argument of counsel. (Record at 416–18.) We consider now the alleged improprieties.

■ First, argues appellant, the prosecutor misstated the testimony of a government witness: that appellant had "offered to sell a .38 or .45 [pistol]" (Record at 386), when in fact the witness testified, "I can't remember specifically what [the pistol] was. I think a .45." (Record at 348.) Appellant points out that since the murder weapon was a .38, the prosecutor's imprecise reference to what the witness testified to left a suggestion with the jury that appellant had had in his possession *prior* to the shooting the very gun that caused the victim's death. We are not persuaded that the prosecutor's comment constituted "a deliberate, calculated and successful effort to prejudice the defendant by reference to matter[s] that [were] not in evidence." *Villacres v. United States,* 357 A.2d 423, 428 (D.C.1976), *quoting United States v. Whitmore,* 156 U.S. App.D.C. 262, 266, 480 F.2d 1154, 1158 (1973). Rather, we deem the reference to have been a misstatement engendered by the normal confusion and tension of trial. *King v. United States,* 125 U.S.App.D.C. 318, 330–31, 372 F.2d 383, 395–96 (1967). Certainly, it does not amount to plain error.

■ Next, appellant asserts that the prosecutor in her closing argument implied that the appellant's presence during the trial enabled him to tailor his testimony to present the most plausible defense available to him. We have held that it is impermissible to attempt to cause the jury to draw

---

**5.** In that case, after indictment by a grand jury for tax evasion, one defendant at trial answered certain questions in a manner consistent with innocence. Over his objection, he was subjected to cross-examination which revealed that he had exercised his Fifth Amendment privilege rather than answer those same questions before the grand jury. In those particular circumstances the Court held this cross-examination to be prejudicial error. *Id.,* 353 U.S. at 415–24, 77 S.Ct. at 979–84.

adverse inferences from appellant's exercise of his constitutional right to confront witnesses against him. *Dyson v. United States,* 418 A.2d 127, 131 (D.C.1980). Perhaps, from certain of the prosecutor's closing remarks in this case, in isolation, that intent could be ascribed to her. The sorts of remarks we have held objectionable, however, have been far more explicit comments. *See, e.g., id.; Jenkins v. United States,* 374 A.2d 581, 584 (D.C.), *cert. denied,* 434 U.S. 894, 98 S.Ct. 274, 54 L.Ed.2d 182 (1977).

The remarks in this case, moreover, are buried in a lengthy closing. Indeed, the trial court noted that the prosecutor substantially exceeded the time allotted for argument. (Record at 414.) Read in the context of the relevant passages, the prosecutor's intent becomes clear. She was not attempting to undercut appellant's constitutional rights but, rather, was suggesting a theory of the case, based on permissible inferences from the evidence, and in contrast to the theory to which appellant testified, which is consistent with a charge of second-degree murder. She was, in other words, supplying an alternative explanation to appellant's claim that he was an unwitting party to a terrible accident; showing that the evidence can also support the inference that he was a calculating and violent person, capable of the malice aforethought necessary to the second-degree murder charge. Under these circumstances, the prosecutor's remarks simply do not rise to the level of "plain error" affecting "substantial rights." *Watts v. United States, supra,* 362 A.2d at 709. We refer again to *Donnelly v. DeChristoforo, supra:*

> Isolated passages of a prosecutor's argument, billed in advance to the jury as a matter of opinion not of evidence do not reach the same proportions [as consistent and repeated misrepresentation]. Such argument, like all closing arguments of counsel, are seldom carefully constructed *in toto* before the event; improvisation frequently results in syntax left imperfect and meaning less than crystal clear. [416 U.S. 646–47, 94 S.Ct. 1873.]

Last, appellant objects to use by the prosecutor in her argument of the testimony by government witnesses that appellant had had two different pistols in his possession at times *prior* to the shooting. He complains of the prosecutor's argument which suggested that, by virtue of appellant's *past* possession of guns, he was more likely than the victim to have had the murder weapon in his possession on the night of the shooting. Specifically, the prosecutor argued:

> But you did hear who did own a gun and who did even offer to sell guns—the Defendant sitting here in front of you. He had a pearl-handle .22 in his possession for a while in his apartment. He offered to sell a .38 or .45 to Mr. Fillie when he started to drive a cab. And he did this on more than one occasion.

> And I would submit to you, ladies and gentlemen, that he had this gun in his possession (Indicating) when he shot Teresa Daniels. There's no reason to believe Teresa had a gun or even had the opportunity to go get one. Even if she had been upset at the phone call, when would she have had the opportunity to go down—what? Did she go down on the street, look around at 11th and O trying to find someone who's got a gun and then go back up? Hardly.

> She didn't do that. She wasn't the kind of person to do that. She didn't have the opportunity to do that. [Record at 387.]

We have earlier concluded that the government properly presented as evidence to the jury that appellant had lied to the police when he stated to them upon questioning after the shooting that he had never owned a gun. As was pointed out, evidence of a falsehood by an accused gives rise to an inference of consciousness of guilt on his part which the jury may properly consider. *United States v. Kahan, supra.* Appellant contends, however, that the prosecutor's argument, quoted above, clearly referred to something other than a consciousness of

guilt on the part of appellant. The prosecutor's argument was that appellant's prior ownership of guns showed that the murder weapon which killed the victim "belonged to this defendant [appellant]." Also, appellant urges that evidence of prior ownership of guns was used improperly as an implicit argument to the jury that because of the commission of prior bad acts by appellant he committed the crime charged here.

We reject the contention that the prosecutor's argument made improper use of evidence of prior bad acts because the ownership of a pistol, without more, is not a "bad act." [6] We do conclude, however, that it was error for the prosecutor to suggest that the particular pistol which caused the victim's death *belonged* to the appellant solely because appellant had owned *other* guns in the past. Such an assertion simply was a *non sequitur* without support in the evidence and should not have been made.

■ The issue then becomes whether this portion of the prosecutor's argument that the pistol causing the victim's death "belonged" to appellant was so prejudicial as to require reversal. As we have noted, the defense made no relevant objection [7] and so the plain error standard is mandated. *Watts v. United States, supra.* While no special charge was requested, the trial court gave the standard instruction that the case was to be decided on the evidence and *not* on counsel's argument. (Record at 417.)

It strikes us from the verdict reached that the jury heeded this instruction. Had the jurors found appellant guilty of murder, as charged, then we could not say with any confidence that the jury did in fact ignore the prosecutor's misstatement of the evidence in her argument. This is so because the ownership of the murder weapon would

have been relevant to the proof of malice aforethought and intent on appellant's part. Put another way, because "manslaughter" occurs where homicide is committed at a time of mutual combat or where it is committed in passion caused by adequate provocation, *United States v. Hardin*, 143 U.S. App.D.C. 320, 323–24, 443 F.2d 735, 738–39 (1970), the jury in this case, if it had reached a verdict of murder, would have had to have rejected appellant's version of his altercation with the decedent. Prior ownership of the murder weapon, in our view, would have made his account highly unlikely and so would have indicated a murder conviction. In fact, however, the jury found appellant guilty only of involuntary manslaughter, the gravamen of which would be the grossly reckless mishandling of the weapon which caused the death of the victim *regardless of ownership*. Under these narrow circumstances, we decline to reverse appellant's conviction.[8]

*Affirmed.*

---

**6.** A pistol, properly licensed, may be kept on the owner's premises.

**7.** The defense did object to the testimony of Richard Fillie regarding appellant's offers to sell him a pistol on the grounds of hearsay (Record at 248), and this objection was properly overruled. At no time did appellant object to the testimony concerning his prior posses-

sion of pistols on grounds that it was irrelevant or unduly prejudicial.

**8.** We admit to concern about the series of alleged improprieties in the prosecutor's conduct here. We are confident that care will be taken in the future to avoid any appearance of impropriety.